1  ANDRÉ BIROTTE JR.
   United States Attorney
2  ROBERT E. DUGDALE
   Assistant United States Attorney
3  Chief, Criminal Division
   CAROL A. CHEN(Cal. State Bar No.: 212720)
4  Assistant United States Attorney
   General Crimes Section
5       1200 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-2428
7       Facsimile: (213) 894-0141
        E-mail: carol.chen@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10                  UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12

13  UNITED STATES OF AMERICA,        )  CR No. 10-262-SVW
                                     )
14           Plaintiff,              )  GOVERNMENT'S OPPOSITION TO
                                     )  DEFENDANT'S MOTION TO
15           v.                      )  SUPPRESS EVIDENCE SEIZED IN
                                     )  THE SEARCH OF MR.
16  LAMBERT GRANDBERRY,              )  GRANDBERRY'S PERSON AND THE
                                     )  PREMISES AT 3418 ARLINGTON ON
17           Defendant.              )  OR ABOUT JANUARY 25, 2010;
                                     )  DECLARATIONS OF PATRICK
18                                   )  ALUOTTO, CESAR OROZCO, AND
                                     )  ARMANDO MENDOZA; EXHIBITS
19                                   )
                                     )  HEARING DATE:      08/16/10
20                                   )  HEARING TIME:      11:00 am
                                     )
21  _____

22

23      Plaintiff United States of America, through its attorney of

24  record, Assistant United States Attorney Carol A. Chen, hereby

25  submits its opposition to the motion to suppress evidence seized in

26  the search of defendant's person and the premises of 3418 Arlington

27  Avenue on or about January 25, 2010 filed by defendant Lambert

28  Grandberry.

1    This opposition is based upon the accompanying Memorandum of

2  Points and Authorities, the Declarations Los Angeles Police

3  Department Detective Patrick Aluotto and Los Angeles Police

4  Department Officers Cesar Orozco and Armando Mendoza.

5  DATE: July 26, 2010              Respectfully submitted,

6                                   ANDRÉ BIROTTE JR.
                                     United States Attorney
7
                                     ROBERT E. DUGDALE
8                                    Assistant United States Attorney
                                     Chief, Criminal Division
9

10
                                     ___/s/_____
11                                   CAROL A. CHEN
                                     Assistant United States Attorney
12
                                     Attorneys for Plaintiff
13                                   United States of America

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF CONTENTS

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES . . . . . . . . . . . . 3

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . 3

II.   FACTS . . . . . . . . . . . . . . . . . . . . . . . 3

      A.   Defendant's Parole Status and the Terms and
           Conditions of Defendant's Parole . . . . . . . . 3

      B.   January 14, 2010 Narcotics Sale . . . . . . . . . 5

      C.   Surveillance of Defendant Between January 14, 2010
           and January 25, 2010 . . . . . . . . . . . . . 6

      D.   The Parole Searches . . . . . . . . . . . . . . 7

III.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . 9

      A.   Assuming the Facts Stated in His Declaration
           are True, Defendant Lacks Standing to Challenge
           the Searches of the Arlington Avenue Residence
           and the Car. . . . . . . . . . . . . . . . . . 9

      B.   The Search of the Arlington Avenue Residence
           and the Car Were Lawful Parole Searches. . . . . 14

           1.   The Law Enforcement Officers Knew of
                Defendant's Parolee Status and the Search
                Conditions Prior to Conducting the Challenged
                Searches . . . . . . . . . . . . . . . . . .15

           2.   The Officers had Probable Cause to
                Believe Defendant was Living at the Arlington
                Avenue Residence When They Conducted the Parole
                Searches. . . . . . . . . . . . . . . . 18

      C.   Because Defendant Failed to Set Forth a Factual
           Dispute as to Standing or to Probable Cause to
           Search the Arlington Avenue Residence and the Car,
           No Evidentiary Hearing is Required. . . . . . . 22

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . 23

i

## TABLE OF AUTHORITIES

**FEDERAL CASES**

<u>Cuevas v. De Roco</u>,
        531 F.3d 726 (9th Cir. 2008) ........................... 19

<u>Minnesota v. Carter</u>,
        525 U.S. 83 (1998) ................................. 8, 9

<u>Minnesota v. Olson</u>,
        495 U.S. 91 (1990) ............................. 7, 8, 9

<u>Moreno v. Baca</u>,
        431 F.3d 633 (9th Cir. 2005) ........................... 13

<u>Motley v. Parks</u>,
        432 F.3d 1072 (9th Cir. 2005) ................. 12, 16, 18

<u>Nicholson v. Bakersfield Police Officer</u>,
        2009 WL 102715 (E.D. Cal. 2009) ....................... 20

<u>Rakas v. Illinois</u>,
        439 U.S. 128 (1978) ..................................... 7

<u>Samson v. California</u>,
        547 U.S. 843 (2006) ........................... 10, 12, 13

<u>United States v. $40,955.00</u>,
        554 F.3d 752 (9th Cir. 2009) .......................... 8

<u>United States v. Aguirre</u>,
        839 F.2d 854 (1st Cir. 1988) .......................... 8

<u>United States v. Brinegar</u>,
        338 U.S. 160 (1949) .................................. 18

<u>United States v. Butcher</u>,
        926 F.2d 811 ........................................ 14

<u>United States v. Howard</u>,
        447 F.3d 1257 (9th Cir. 2006) .................... passim

# TABLE OF AUTHORITIES

**FEDERAL CASES**

United States v. Hoskin,
    2007 WL 3228408 (W.D. Wash. Oct. 31, 2007) . . . . . . . . . . . .   19

United States v. Howell,
    231 F.3d 615 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . 20, 21

United States v. Lopez,
    474 F.3d 1208 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 12, 13

United States v. McAdoo, Number CR 07-00860,
    2008 WL 682612  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

United States v. Randolph,
    210 F. Supp. 2d 586 (E.D. Pa. 2002) . . . . . . . . . . . . . . . . . 10

United States v. Sarkisian,
    197 F.3d 966 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . .  7, 8

United States v. Taylor,
    482 F.3d 315 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . .  9, 10

United States v. Venson,
    2009 WL 1565736 (W.D. Pa. 2009) . . . . . . . . . . . . . . . . . . 10, 11

United States v. White,
    622 F. Supp. 2d 34 (S.D. NY. 2008) . . . . . . . . . . . . . . . . . . 10

United States v. Williams,
    417 F.3d 373 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 10

# TABLE OF AUTHORITIES

**STATE CASES**

People v. Boyd,
        224 Cal. App. 3d 736 (1990) .............................  20

People v. Reyes,
        19 Cal. 4th 743 (1998) .................................  13


**FEDERAL STATUTES**

21 U.S.C. § 841(a)(1),Þ(b)(1Þ(B)(iii) ........................  2

18 U.S.C. § 924(c)(1)(A)(I) ..................................  2

**STATE STATUTES**

Cal. Penal Code § 3060.5 ....................................  13

Cal. Penal Code § 3067(a) ...................................  13

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Defendant Lambert Grandberry ("defendant") is charged in a three-count indictment with (1) distribution of cocaine base in the form of crack cocaine under 21 U.S.C. § 841(a)(1), (b)(1)(B)(iii); (2) possession with intent to distribute cocaine in the form of crack cocaine under 21 U.S.C. § 841(a)(1), (b)(1)(A); and (3) possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A)(I).

The charges against defendant stem from a narcotics investigation conducted by the Los Angeles Police Department ("LAPD") in January 2010. Officers had received information that defendant, a known Rollin' 30's Gang member with the street moniker "Looney" or "Big Looney" was engaging in the sale of narcotics. Officers discovered that defendant had a prior state narcotics conviction in 2008, for which he was on active parole status and subject to search conditions. Officers conducted surveillance on defendant and on January 14, 2010, they observed him engage in a sale of 6.77 grams of crack cocaine. Officers arrested the buyer and thereafter continued to conduct surveillance on defendant between January 14, 2010 and January 25, 2010.

On January 25, 2010, officers conducted a parole search of defendant. The parole search of his person occurred outside an apartment building located at 3418 South Arlington Avenue in Los Angeles, California ("the Arlington Avenue Residence") and after defendant had attempted to run from officers and thrown the keys to the Arlington Avenue Residence into a yard. Officers found $267 on defendant's person. Officers used the keys they recovered to

1

1  search a unit in the Arlington Avenue Residence and recovered
2  several rocks of crack cocaine, a digital scale, razor blades, two
3  large measuring cups, a small pot containing off-white residue
4  resembling crack cocaine, $1,305 in various denominations, a loaded
5  9mm gun, and mail addressed to defendant at another address.  The
6  car defendant had been observed driving between January 14, 2010
7  and January 25, 2010, was also searched and one rock of crack
8  cocaine was found.  The evidence recovered from the searches and
9  from the January 14, 2010 sale of narcotics led to the filing of
10 the indictment against defendant.

11      Defendant has filed a motion to suppress the evidence of his
12 crimes.  Defendant makes two arguments, both of which lack merit.
13 First, he posits that officers did not know of his parole status
14 prior to conducting the searches.  (Deft's Mot. at 9-10.)  That
15 hypothesis is belied by the uncontroverted facts that prior to
16 January 14, 2010, officers researched his status and confirmed that
17 he was on active parole and subject to search conditions as a
18 result of a 2008 state narcotics conviction.  Second, defendant
19 contends that the parole searches of the Arlington Avenue Residence
20 and the car were unconstitutional because officers lacked probable
21 cause to believe that he lived at the location.  (Deft's Mot. at 9-
22 10.)  As a threshold matter, defendant has failed to meet his
23 burden of alleging facts sufficient to establish standing to raise
24 this claim.  Moreover, even were it enough, no violation occurred.
25 The officers had ample probable cause to believe that defendant
26 resided at the Arlington Avenue Residence.  Among other things, the
27 officers observed defendant entering and exiting the residence on
28 multiple occasions between January 14, 2010 and January 25, 2010,

including the day of the searches, the officers observed defendant through the window of a second-floor unit on several occasions, the officers observed the car defendant had been seen driving parked outside of the residence on multiple occasions during the eleven-day period, the officers observed male clothing and mail addressed to defendant inside the residence, and defendant had keys to the residence and car on his person.  Defendant's motion to suppress should be denied.

## II.   FACTS

**A.   Defendant's Parole Status and the Terms and Conditions of Defendant's Parole**

In January 2010, LAPD Detective Patrick Aluotto and LAPD Officers Cesar Orozco and Armando Mendoza were assigned to the Southwest Narcotics Enforcement Detail ("NED").  (Decl. of Aluotto ¶ 7; Decl. of Orozco ¶ 6; Decl. of Mendoza ¶ 7.)  Sometime in January 2010, Detective Aluotto received information telephonically from a civilian who wished to remain anonymous that an individual was engaged in the sales of narcotics in a garage structure to the rear of 2351 W. 31st Street in Los Angeles, California.  (Decl. of Aluotto ¶ 7.)  Based on his own experiences in investigating and arresting drug dealers, and his interactions with other officers of the LAPD, including those in the gang unit, Detective Aluotto believed the location was within the Rolling 30's Gang territory. (Id.)  He contacted an informant, with whom he had been working for about six months and who had previously provided reliable information regarding narcotics sales in the area.  (Id.)  The informant told Detective Aluotto that 2351 W. 31st Street was "Looney's spot," referring to an individual with a street moniker

3

1   of "Looney." (Id.) Detective Aluotto thereafter drove the
2   informant past the location in plain clothes and in an unmarked
3   police vehicle, and the informant pointed out a red Pontiac as
4   being defendant's car. (Id.)

5       Detective Aluotto spoke with LAPD Officer Craig Piantanida.
6   Officer Piantanida informed him that defendant (aka "Looney") had
7   gone away for a while due to a state felon-in-possession conviction
8   which he had helped secure and that he had heard that defendant was
9   out selling drugs again. (Id. ¶ 8.) Acting on the anonymous
10  complaint, the informant's tip, and his conversation with Officer
11  Piantanida, Detective Aluotto accessed the Los Angeles County CCHS
12  criminal history database, which showed that defendant had several
13  prior arrests and convictions, including for narcotics trafficking.
14  (Id.) In particular, he noted a 2008 conviction for possession
15  for sale of narcotics, in violation of California Health and Safety
16  Code Section 11351.5, in Los Angeles Superior Court, case number
17  BA332590, for which defendant received a sentence of three years
18  imprisonment. (Id.) The conviction date and length of the
19  sentence meant that if defendant was out on the streets he was
20  likely on parole. (Id.) Officer Orozco searched a law enforcement
21  database containing parole information and found that the database
22  stated that defendant was on active parole from July 24, 2009 to
23  July 24, 2012. (Decl. of Orozco ¶ 8.) Based on their experiences
24  and training, Officers Orozco and Mendoza shared Detective
25  Aluotto's understanding that given the type of crime for which he
26  was convicted (i.e. state narcotics offense resulting in three
27  years of imprisonment), defendant would have had search conditions
28  as part of his parole. (Decl. of Orozco ¶ 8; Decl. of Aluotto ¶¶

4

8-9; Decl. of Mendoza ¶¶ 8-9.)

Indeed, upon his release from state custody on July 24, 2009 to begin his three-year period of parole, defendant had been given and had signed a list of conditions.  (Exh. A.)  Defendant was advised that his conditions of parole included the following:

> You and your residence and any property under your control may be searched without a warrant by an agent of the Department of Corrections or any law enforcement officer.

Id.

B.   **January 14, 2010 Narcotics Sale**

On January 14, 2010, Detective Aluotto, Officer Orozco, and Officer Mendoza conducted surveillance on the garage structure located at the rear of 2351 W. 31st Street in order to determine whether defendant was engaging in narcotics sales out of that location.  (Decl. of Aluotto ¶ 10; Decl. of Orozco ¶ 9; Decl. of Mendoza ¶ 9.)  Officer Mendoza subsequently saw an individual he identified as defendant engage in the sale of what appeared to be crack cocaine with a female black adult later identified to be Marilyn Bagby.  (Decl. of Orozco at ¶ 9; Decl. of Aluotto ¶ 11; Decl. of Mendoza ¶ 10).  Defendant was observed walking back into the garage structure, while Bagby got into a vehicle and drove away.  (Decl. of Aluotto ¶ 10; Decl. of Orozco ¶ 9; Decl. of Mendoza ¶ 10.).  A traffic stop was performed on Bagby's car, resulting in the recovery of a baggy of crack cocaine and Bagby's arrest.  (Decl. of Aluotto ¶ 11; Decl. of Orozco ¶ 10; Decl. of Mendoza ¶ 11.)

Defendant was not arrested that day.  (Decl. of Aluotto ¶ 12; Decl. of Orozco ¶ 10; Decl. of Mendoza ¶ 11.)  The officers decided to conduct additional surveillance upon defendant in order to gauge

the extent of his narcotics activities and to see if they could discover the identity of his narcotics supplier. (Decl. of Aluotto ¶ 12; Decl. of Orozco ¶ 10; Decl. of Mendoza ¶ 12.)

## C.   Surveillance of Defendant Between January 14, 2010 and January 25, 2010

On multiple occasions between January 14, 2010 and January 25, 2010, the officers conducted surveillance near the 31st Street residence and observed defendant get into the car the informant had pointed out as defendant's, and drive to the Arlington Avenue Residence a few blocks away. (Decl. of Aluotto ¶ 12; Decl. of Orozco ¶ 11.)  Defendant was observed walking into the apartment building. (Decl. of Aluotto ¶ 12; Decl. of Orozco ¶ 11)  Between January 14, 2010, and January 25, 2010, defendant was observed physically present at the Arlington Avenue Residence on at least five occasions - he would drive to the location in the car and on some of the occasions, he was observed driving between the location and the 31st Street residence. (Decl. of Aluotto ¶¶ 12-13; Decl. of Orozco ¶ 13.)  Defendant parked his car on the street outside of the Arlington Avenue Residence, used keys in his possession to get into the building, and walked up to the second floor of the building.  Defendant would go up to a second-floor unit, which the officers knew occurred because they would later see defendant through the window of a unit or looking out of the window, and/or they would see lights being turned on in the unit. (Decl. of Aluotto ¶¶ 12-13; Decl. of Orozco ¶¶ 13-14; see also Decl. of Mendoza ¶¶ 12-13.)

On one occasion, after defendant was observed looking out of the window, defendant came out of the building with a bag and got

6

into the passenger seat of a car.  He thereafter got out of the car empty-handed and went back into the Residence.  (Decl. of Orozco ¶ 15; Decl. of Mendoza ¶ 13.)  Based on that incident and the fact that defendant was observed engaging in counter-surveillance moves upon leaving the Arlington Avenue Residence, the officers believed that defendant lived at the Residence and stored his drugs there, that he had bought drugs from his supplier on that occasion, and that he sold drugs out of the 31st Street Residence.  (Decl. of Orozco ¶ 19; Decl. of Mendoza ¶ 16.)   In addition to seeing defendant go in and out of the Arlington Avenue Residence, the officers conducted pass-by surveillance and observed the car parked outside of the building in excess of ten times during different times of the day between noon and 10 p.m. from  January 14, 2010 to January 25, 2010.  (Decl. of Orozco ¶ 16.)  The officers believed that defendant was present in the Arlington Avenue Residence on those occasions.  (Id.)

Though the officers knew that defendant had reported a Manhattan Place address with his parole agent, they had gone to that address on one occasion after January 14, 2010 and did not see defendant or his car there.  (Decl. of Aluotto ¶ 13; Decl. of Orozco ¶ 18; Decl. of Mendoza ¶ 15.)  Based on their experience and training, they knew that it was common for drug-dealers and other criminals to list sham addresses in order to conceal their illegal activities.  (Decl. of Aluotto ¶ 13; Decl. of Orozco ¶ 18; Decl. of Mendoza ¶ 14.)

D.   **The Parole Searches**

On January 25, 2010, after observing defendant come out of the Arlington Avenue Residence, lock the door of the building, get into the car, and drive away, the officers decided to wait for defendant

to come back in order to arrest him for the January 14, 2010 narcotics sale. (Decl. of Aluotto ¶ 14; Decl. of Orozco ¶ 20; Decl. of Mendoza ¶ 16.) When defendant drove back to the Residence, parked the car and got out, and walked up the driveway, Officer Mendoza identified himself as a police officer and told defendant to turn around. (Decl. of Mendoza ¶ 17; Decl. of Orozco ¶ 21.) Defendant immediately ran from Officer Mendoza, toward the rear of the building, and threw a set of keys into a yard. (Decl. of Aluotto ¶ 15; Decl. of Mendoza ¶ 17; Decl. of Orozco ¶ 21.) Officer Mendoza and Detective Aluotto arrested defendant, who was resisting, while Officer Orozco recovered the keys defendant had thrown. (Decl. of Aluotto ¶ 15; Decl. of Orozco ¶ 21; Decl. of Mendoza ¶ 17.) Officer Orozco told defendant, "You are on parole with search conditions. We are going to search your place now." (Decl. of Orozco ¶ 21; Decl. of Aluotto ¶ 15.) Defendant responded, "Do what you gotta do." (Decl. of Orozco ¶ 21; Decl. of Aluotto ¶ 15.)

Thereafter, Officers Mendoza and Orozco, aided by LAPD Officer Craig Washington, used the keys defendant had thrown onto the ground to enter the building and unlock the door of defendant's unit. (Decl. of Orozco ¶ 22; Decl. of Aluotto ¶ 15; Decl. of Mendoza ¶ 18.) Once inside, the officers observed chunks of substances resembling crack cocaine as well as a digital scale, two large Pyrex measuring cups, and a small pot, each of which contained additional off-white residue resembling crack cocaine, on the kitchen floor. (Decl. of Aluotto ¶ 16; Decl. of Orozco ¶ 22; Decl. of Mendoza ¶ 18.) From a bedroom closet, the officers also recovered more solids resembling crack cocaine, a ceramic plate with the substance and two razor blades, and $1305. (Decl. of

1  Aluotto ¶ 16; Decl. of Orozco ¶ 22; Decl. of Mendoza ¶ 18.)  In the

2  living room closet, officers discovered a loaded 9mm firearm.

3  (Decl. of Aluotto ¶ 17; Decl. of Orozco ¶ 22; Decl. of Mendoza ¶

4  18.)  There was also male clothing and mail addressed to defendant

5  at defendant's reported Manhattan Place address in the apartment.

6  (Decl. of Aluotto ¶ 16; Decl. of Mendoza ¶ 19; Decl. of Orozco ¶

7  22.)

8      Officer Orozco searched defendant's car and recovered a

9  substance resembling crack cocaine.  (Decl. of Orozco ¶ 23; Decl.

10  of Mendoza ¶ 20; Decl. of Aluotto ¶ 17.)  That day, defendant's

11  person was also searched and he was found to be in possession of

12  $267.  (Decl. of Aluotto ¶ 15.)

### III.   ANALYSIS

**A.   <u>Assuming the Facts Stated in His Declaration are True,
    Defendant Lacks Standing to Challenge the Searches of the
    Arlington Avenue Residence and the Car.</u>**

16      Defendant argues that the parole searches of the Arlington

17  Avenue Residence and the car may have been unlawful and that it is

18  the government's burden to prove otherwise.  Defendant, however,

19  has failed to establish standing to raise this claim.  "A person

20  who is aggrieved by an illegal search and seizure only through the

21  introduction of damaging evidence secured by a search of a third

22  person's premises or property has not had any of his Fourth

23  Amendment rights infringed."  <u>Rakas v. Illinois</u>, 439 U.S. 128, 134

24  (1978).  "To establish standing to challenge the legality of a

25  search or seizure, the defendants must demonstrate that they have

26  a "legitimate expectation of privacy" in the items seized or the

27  area searched."  <u>United States v. Sarkisian</u>, 197 F.3d 966, 986 (9th

28  Cir. 1999); <u>see also</u> <u>Minnesota v. Olson</u>, 495 U.S. 91, 95 (1990)

("[C]apacity to claim the protection of the Fourth Amendment depends upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (quotations omitted).  This is defendant's burden and to meet it, he "must manifest a subjective expectation of privacy in the area searched, and [his] expectation must be one that society would recognize as objectively reasonable." <u>Sarkisian</u>, 197 F.3d at 986; <u>United States v. $40,955.00</u>, 554 F.3d 752, 756 (9th Cir. 2009) ("Appellants have the burden of establishing their legitimate expectations of privacy.").[1]  This is determined by a totality of the circumstances.  <u>Sarkisian</u>, 197 F.3d at 986.

Defendant has submitted an unsigned declaration stating that he did not live at the Arlington Avenue Residence but rather that his unidentified girlfriend lived there and that he had been an invited overnight guest at her apartment on January 24, 2010. (Grandberry Decl. ¶ 3.)  He states that he had stayed overnight at the apartment on other occasions and that his girlfriend had lent him her car to use on January 25, 2010.  <u>Id.</u> ¶¶ 3, 4.  Defendant also admits that he has been on parole since July 2009.  <u>Id.</u> ¶ 4. Based on these facts, defendant believes that he has standing pursuant to <u>Minnesota v. Olson</u>, 495 U.S. 91, and <u>Minnesota v. Carter</u>, 525 U.S. 83, 90 (1998).  (Deft' Mot. at 6-7.)  He is

---

[1]  Defendant cites no legal support for his position that he "need not establish standing to challenge the search that took place which was not a valid parole search."  (Deft's Mot. at 6.) Nor can he.  <u>See, e.g.</u> <u>United States v. Aguirre</u>, 839 F.2d 854, 856 (1st Cir. 1988) ("What courts have come to refer to as "standing" - the purchase necessary to come to grips with an allegedly illegal search and seizure - is unlike, say, the presumption of innocence: it does not automatically devolve upon every accused . . . . Unless and until the "standing" threshold is crossed, the *bona fides* of the search and seizure are not put legitimately into issue.")

mistaken.  The facts proffered in his unsigned declaration, even if true, do not establish that he had a legitimate expectation of privacy in the Arlington Avenue Residence and the car.

Defendant's reliance on Olson and Carter and his declaration is misplaced.  In Olson, 495 U.S. at 98, the Supreme Court held that a houseguest has a legitimate expectation of privacy in his host's home sufficient to "enable him to be free in that place from unreasonable searches and seizures."  The defendant, who held the status of a guest, had been arrested in a third party's home without a warrant.  The Supreme Court concluded that the defendant had standing to challenge the intrusion into the third party's home because he had an expectation of privacy as an overnight guest that society recognizes as reasonable.  Id. at 96-97.  Significantly, the defendant in Olson was not a parolee .  Defendant's "Fourth Amendment rights as a guest are limited to those that he could assert with respect to his own residence."  United States v. Taylor, 482 F.3d 315, 318 (5th Cir. 2007).[2]  In Taylor, the Fifth Circuit considered the extent to which the defendant, who was on state court supervised release, had the right to assert Fourth Amendment protections to his girlfriend's apartment.  Officials located defendant at the apartment, arrested him, and searched the premises, resulting in the recovery of a firearm.  The defendant moved to suppress the firearm, claiming standing to assert a Fourth Amendment violation because he was an overnight guest in his girlfriend's apartment.  In noting that Olson simply extended to

---

[2]   In Carter, the Supreme Court cited to the case of Olson for the proposition that an overnight guest in a home may claim the protection of the Fourth Amendment.  525, U.S. at 90.  However, the facts of Carter are inapposite, as like in Olson, the defendants were not parolees.  The Carter court found that defendants who were in another person's apartment for a short time solely for the purpose of packaging cocaine had no legitimate expectation of privacy in the apartment.  Carter does not aid defendant.

the houseguest the Fourth Amendment rights he would have in his own home, the Taylor court emphasized that those protections were more limited than those afforded to the average citizen because the defendant had agreed as a condition of supervised release to a search of his person, residence, or vehicle at any time.  Id. at 318; see United States v. White, 622 F.Supp.2d 34, 42 n.5 (S.D. NY. 2008) (same).  The Fifth Circuit held that the defendant could not claim his Fourth Amendment rights were violated.  Id. at 319.

Other courts have similarly held that the standing analysis is "not controlled solely by a defendant's status as an overnight houseguest, but must also account for the fact that he [is] a parolee." United States v. Venson, 2009 WL 1565736 * 7 (W.D. Pa. 2009).  The Venson court noted that in Samson v. California, 547 U.S. 843 (2006), the Supreme Court had emphasized that parolees "have severely diminished expectation of privacy by virtue of their status alone." Id. at 852.  The Venson court further noted that parolees "d[o] not have an expectation of privacy that society would recognize as legitimate." Id.; see also Samson, 547 U.S. at 850 (in upholding suspicionless search of parole under California law, finding government has substantial interest in supervising parolees and parolees have even fewer expectations of privacy than probationers because parole is more akin to imprisonment); United States v. Williams, 417 F.3d 373, 376 (3d Cir. 2005) (recognizing that a parolee's expectation of privacy is less than average citizen's); United States v. Randolph, 210 F.Supp.2d 586 (E.D. Pa. 2002), aff'd, 80 Fed. Appx. 190 (3d Cir. 2003) (parolee who was a fugitive from a halfway house did not have reasonable expectation of privacy to room in house in which he lived during his fugitive

12

status so warrantless search did not violate Fourth Amendment).  In Venson, 2009 WL 1565736 * 7, the court concluded that the defendant did not have a legitimate expectation of privacy in his hosts' residence when it was searched because he was on parole:

> If this court were to recognize that a parolee such as defendant has a reasonable expectation of privacy in the home of a third party, it would grant him greater rights in the third party's home than he would have in his own home.

Here, defendant's active parole status on January 25, 2010 is undisputed.  (Grandberry Decl. ¶ 3); (Exh. A to Govt's Opp.)  It is also undisputed that he had consented to search conditions pertaining to his person, residence, and any property within his control.  (Exh. A to Govt's Opp.)  Because defendant consequently would have no legitimate expectation of privacy in his own residence or car, he also would not have such protection in his girlfriend's residence or her car and would have no standing.

Finding that defendant does not have standing to challenge the constitutionality of the searches of the Arlington Avenue Residence and the car is consistent with the precedents of this district.  On January 15, 2010, the Honorable George H. King denied the defendant's motion to suppress in  United States v. Doucette, CR 09-217-GHK.  The Court's Minute Order is attached as Exhibit B to this opposition brief.  Law enforcement officials had conducted a parole search of the defendant outside of a residence on 59th Place in Los Angeles, California.  Doucette Minute Order at 1.  They later searched the 59th Place Residence and recovered a digital scale, marijuana plants, a handgun, and more than 650 rounds of ammunition.  The defendant was on a three-year active parole term and was subject to suspicionless searches by law enforcement as a

13

1   condition of his parole.  Defendant moved to suppress the evidence.

2   Id.  Judge King surveyed the legal landscape on parole searches,

3   including the Supreme Court's decision in Samson and the Ninth

4   Circuit's decisions in United States v. Lopez, 474 F.3d 1208 (9th

5   Cir. 2007), Motley v. Parks, 432 F.3d 1072, 1080 (9th Cir. 2005),

6   and United States v. Howard, 447 F.3d 1257 (9th Cir. 2006).[3]  Judge

7   King concluded that

> Given that the Fourth Amendment protects people, not places,
> and a parolee has no reasonable expectation of privacy in
> either his person or his residence, it follows that a parolee
> similarly does not have an expectation of privacy in a third
> party residence that society would recognize as legitimate.
> We find this conclusion compelled by both precedent and logic,
> for "[a]ny other rule would diminish the protection to
> society given by the search condition of parole, permitting
> search at any time.  Lopez, 474 F.3d at 1213.  The result is
> also one of sound policy; "[t]hat the Fourth Amendment should
> not offer special sanctuary to felons serving part of their
> sentence is an outcome not to be regretted."  Howard, 447 F.3d
> at 1269 (Noonan, J., concurring).  Without a reasonable
> expectation of privacy in the home of a third party, Defendant
> lacks standing to challenge a search of the residence.

16  Doucette Minute Order at 3-4.  While not binding on this Court,

17  Judge King's reasoning is directly on-point here and useful for

18  this Court.  Assuming the facts in his declaration as true,

19  defendant lacked a reasonable expectation of privacy in his

20  girlfriend's apartment unit and car.  The Court need not consider

21  defendant's challenge to the searches.

22  **B.   The Search of the Arlington Avenue Residence and the Car Were
       Lawful Parole Searches.**

23      Should the Court disagree and conclude that defendant has

24

25  _____

26      [3]  Judge King also expressly disagreed with United States v.
    McAdoo, No. CR 07-00860, 2008 WL 682612, the lone case to which

27  defendant cites to support his position that officers did not have
    probable cause to believe that he resided at the Arlington Avenue

28  Residence.  (Def't's Mot. at 8); Doucette Minute Order at 3 n.2.  In
    doing so, Judge King specifically noted that the McAdoo opinion did
    not contain "detailed attention" to the matter of standing and
    declined to follow McAdoo's unexamined application of Motley.

1   established standing to challenge the search of the Arlington
2   Avenue Residence and the car, defendant's motion should still be
3   denied.

4       **1.   The Law Enforcement Officers Knew of Defendant's Parolee
             Status and the Search Conditions Prior to Conducting the
5            Challenged Searches.**

6       In California, an "inmate may serve his parole period either
7   in physical custody, or elect to complete his sentence out of
8   physical custody and subject to certain conditions." Samson, 547
9   U.S. at 851 (citing Cal. Penal Code § 3060.5). Every prisoner who
10  chooses the latter "shall agree in writing to be subject to search
11  or seizure by a parole officer or peace officer at any time of the
12  day or night, with or without a search warrant and with or without
13  cause." Cal. Penal Code § 3067(a). The Supreme Court has held
14  that such suspicionless searches of California parolees do not
15  violate the Fourth Amendment. See Samson, 547 U.S. at 857; see
16  also Lopez, 474 F.3d at 1214 (applying Samson to conclude that
17  "under parole conditions a parolee has notice [that] officers may
18  conduct a warrantless, suspicionless search of a parolee's person
19  or residence"). As long as the officer knows the subject is on
20  parole and the search is conducted for rehabilitative, reformative
21  or legitimate law enforcement purposes, i.e., is not arbitrary or
22  done to harass the subject, it is constitutional. Samson, 547 U.S.
23  at 856; see also Moreno v. Baca, 431 F.3d 633, 641 (9th Cir. 2005)
24  (searches of parolees must be based on knowledge that target is
25  subject to parole search condition); People v. Reyes, 19 Cal. 4th
26  743, 753-54 (1998) (discussing California law regarding boundaries
27  of suspicionless parole searches).

28      Defendant speculates that the officers did not know of his
    parole status until after they booked him, thereby making the

                                15

searches   unconstitutional.    (Deft's   Mot.   at   10.)     In   so
hypothesizing, defendant makes several observations, none of which
lend any credence to his position.  First, he states that no parole
officer was involved in or present at the challenged searches.
(Deft's Mot. at 4.)   This contention has no merit.   See United
States v. Butcher, 926 F.2d 811. 814 (9th Cir.), cert denied, 111
S.Ct. 2273 (1991) ("A [California] parole officer is not required
personally to effect the arrest or search of his parolee in order
to validate the arrest or search.")

     Second,  defendant  argues  that  had  officers  contacted  his
parole agent, they "would have learned that he lived on Manhattan
Place  at  the  address  that  [he]  provides  in  his  declaration."
(Deft's Mot. at 10)  The officers did, in fact, know that the
Manhattan  Place  address  was  the  one  defendant  listed  with  his
parole agent.  (Decl. of Aluotto ¶ 13; Decl. of Mendoza ¶ 15; Decl.
of Orozco ¶ 18.)  Based on their experience and training, however,
they also knew that parolees often report sham addresses in order
to hide the commission of acts constituting violations of their
conditions of parole.  (Id.)  Indeed, the officers' surveillance of
defendant led them to believe that the Manhattan Place residence
was a sham address and that defendant was living at the Arlington
Avenue Residence.   (Decl. of Aluotto ¶ 13; Decl. of Mendoza ¶¶ 15-
16; Decl. of Orozco ¶¶ 14, 19.)    It  was  unnecessary  for  the
officers to contact defendant's parole agent, as they researched
defendant's status and confirmed that he was on active parole for
a prior state narcotics violation and subject to search conditions
prior to the challenged searches.  Moreover, it is not uncommon for
officers  to  refrain  from  contacting  parole  agents  in  order  to

16

minimize the risk of parolees being inadvertently tipped off to law enforcement activity.   (Decl. of Orozco ¶ 18.)

Defendant also complains that the investigative reports concerning the narcotics sale on January 14, 2010 and the arrest of defendant on January 25, 2010 lack certain details (i.e., the January 14, 2010 report does not state that he was on parole or probation; they do not detail how he was identified as the seller of the narcotics on January 14, 2010; they do not delineate the connection between the 31st Street residence and the Arlington Avenue Residence; and they do not flesh out the observations of the officers during their surveillance).   (Deft's Mot. at 5, 9.) Defendant does not state how the absence of these details in the reports, including a report concerning the arrest of someone else, are fatal to the government for purposes of his motion.

It is uncontroverted that prior to January 14, 2010, the officers received information that a person was engaging in narcotics sales at the 31st Street location, that the person was identified as being defendant, and that officers researched defendant's criminal history and parole status by accessing law enforcement databases, resulting in confirmation that he was on active parole for a prior state narcotics conviction.   (Decl. of Aluotto ¶¶ 6-9; Decl. of Orozco ¶¶ 6-8; Decl. of Mendoza ¶¶ 7-9.) Based on their experience and training, the officers knew that a person like defendant who was on parole for a prior state narcotics conviction was subject to search conditions.   (Decl. of Aluotto ¶ 9; Decl. of Orozco ¶ 8; Decl. of Mendoza ¶ 9.)

//
//

2.   **The Officers had Probable Cause to Believe Defendant was Living at the Arlington Avenue Residence When They Conducted the Parole Searches.**

Defendant claims that officers lacked probable cause to believe that he resided at the Arlington Avenue Residence. He is mistaken. Officers had probable cause to believe that defendant resided at the location based on facts they had gathered during their investigation of defendant's drug dealing activities and surveillance of defendant.

"When conducting a warrantless search pursuant to a parolee's parole condition, law enforcement officers must have probable cause to believe that the parolee is a resident of the house to be searched." Motley v. Parks, 432 F.3d 1072, 1080 (9th Cir. 2005) (en banc). "[P]robable cause may be based on the collective knowledge of all of the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom." Id. at 1081 (citations omitted). Whether a defendant actually lived at the search location is irrelevant to the question of whether the officers had probable cause to believe he did. Id. at 1082 (probable cause present despite defendant being in custody).

Here, officers had probable cause to believe that defendant resided at the Arlington Avenue Residence and that he controlled the car searched based on the following facts:

- prior to the January 14, 2010 narcotics sale, a reliable informant had pointed out the car to officers as defendant's car; the car was parked in front of the 31st Street location identified as the place where defendant sold drugs;

- on January 14, 2010, officers observed defendant engage in the sale of narcotics at the 31st Street residence and arrested the buyer;

- subsequent to January 14, 2010, officers observed defendant drive the car from the 31st Street location to the Arlington Avenue Residence, park the car in front of

18

the Residence, and get into the apartment building using keys in his possession;

- between January 14, 2010 and January 25, 2010, officers conducted surveillance on defendant and on about five to ten occasions, observed him park the car in front of the Arlington Avenue Residence, use keys in his possession to get into the building;

- after defendant went into the building, movement/lights turning on would be observed through the window of a second-floor apartment unit and on several occasions, defendant was seen through the window and/or looking out of the window;

- on one occasion, officers believed they had just witnessed defendant buying narcotics from a source;

- between January 14, 2010 and January 25, 2010, defendant's car was observed parked in front of the Arlington Avenue Residence in excess of ten times;

- although officers knew that Manhattan Place was listed as defendant's parole address of record, they were aware from their training and experience that parolees often list sham residences to conceal illegal activities;

- on one occasion prior to January 25,2010, officers conducted surveillance on the Manhattan Place address but neither defendant nor his car was physically present;

- the officers believed the Arlington Avenue Residence was located within the Rolling 30's Gang territory and believed defendant is/was associated with the Rolling 30's;

- on January 25, 2010, the day of the challenged searches, officers observed defendant come out of the Arlington Avenue Residence, lock the door of the building, get into the car he parked in front of the residence, and drive away;

- on January 25, 2010, when defendant returned to the Arlington Avenue Residence, he ran away from the officers after they identified themselves and threw the keys into a yard; after he was detained, Officer Orozco stated to him, "You are on parole. We are now going to search your place" and defendant responded to the effect of "Do what you gotta do;"

- officers recovered the keys thrown on the ground by defendant and used them to get into the Arlington Avenue Residence to gain access into the apartment unit and the car, the searches of both yielding evidence of the crimes with which defendant is charged.

19

Based on all of the information described above, the officers had probable cause to believe that defendant was living at or had control over the residence. "In dealing with probable cause, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Motley, 432 F.3d at 1082 (quoting United States v. Brinegar, 338 U.S. 160, 175 (1949) (punctuation omitted). Defendant contends that the facts of this case is similar to that confronted by the Honorable S. James Otero in United States v. McAdoo, CR 07-00860-SJO. (Deft's Mot. at 8.) In that case, Judge Otero granted the defendant's motion to suppress the evidence. (Exh. to Deft's Mot.) Defendant's contention lacks merit, as this case is markedly different from either McAdoo or United States v. Howard, 447 F.3d 1257 (9th Cir. 2006), the case upon which Judge Otero relied. In Howard, 447 F.3d at 1257, the Ninth Circuit surveyed four cases in which the Court upheld the warrantless search of an address not reported by a parolee and observed that certain patterns emerged:

> (1)   First, in each of the four cases, the parolee did not appear to be residing at any address other than the one searched. In three of these four cases, the parolee had reported a different address, but officers had good reason to believe that he was not actually residing at the reported address.

> (2)   Second, in each of the four cases, the officers had directly observed something that gave them good reason to suspect that the parolee was using his unreported residence as his home base (i.e., police saw the parolee running errands to and from the residence; police saw the parolee entering and leaving the house on his own multiple times in the days before the search and also saw the cars of his known associates parked outside; the officer saw mail and notes addressed to parolee at the address in question).

20

(3)   Third, in each of the four cases, the parolee had a key to the residence in question.

(4)   Lastly, in two of the cases, either the parolee's co-resident or the parolee himself identified the residence in question as that of the parolee.

Id. at 1265-66; see Cuevas v. De Roco, 531 F.3d 726, 734 (9th Cir. 2008) (noting that Howard court identified the patterns listed above); United States v. Hoskin, 2007 WL 3228408 * 10 (W.D. Wash. Oct. 31, 2007) (same).

Defendant notes that in McAdoo, Judge Otero concluded that the four Howard patterns are not required elements but that cases upholding a search typically contain at least three of the patterns. (Deft's Mot. at 8.)  He emphasizes that Judge Otero found only one of the Howard pattern factors present in McAdoo and therefore concluded that the officers did not have probable cause to believe the probationer lived at the location searched and suppressed the evidence. (Deft's Mot. at 8; Exh. to Deft's Mot.) This case is nothing like McAdoo. Here, three of the four pattern factors are definitively present in this case and the fourth factor is arguably present as well: (1) defendant did not appear to be actually living at his reported Manhattan Place address based on the officers' surveillance; (2) defendant was observed physically present at the Arlington Avenue Residence on five to ten occasions within a ten-day period and the car identified by an informant as belonging to him and which he was observed driving was seen parked in front of the Arlington Avenue Residence at least fifteen times during the same period; (3) defendant had keys to the Arlington Avenue Residence and the car; and (4) in response to Officer Orozco telling him outside of the Arlington Avenue Residence that officers were going to search "your place," defendant responded to the

21

effect, "do what you gotta do." Under such circumstances, the reasoning and result of <u>McAdoo</u> do not apply. Nor do that of <u>Howard</u>.[4]

Even assuming that defendant and his girlfriend can be deemed to be co-residents or co-habitants, the parole searches of the Arlington Avenue Residence and the car would still be valid. <u>See</u> <u>Nicholson v. Bakersfield Police Officer</u>, 2009 WL 102715 (E.D. Cal. 2009) (search of family home and marital property, such as wife's car might reasonably be areas over which parolee exercised joint possession, access, and/or control, and therefore searches arguably permissible); <u>People v. Boyd</u>, 224 Cal. App. 3d 736 (1990) (authorizing parole search of purse that was "not distinctly feminine" found in trailer co-habited by parolee and his girlfriend).

## C.  **Because Defendant Failed to Set Forth a Factual Dispute as to Standing or to Probable Cause to Search the Arlington Avenue Residence and the Car, No Evidentiary Hearing is Required.**

An "evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." <u>United States v.</u> <u>Howell</u>, 231 F.3d 615, 620 (9th Cir. 2000.) A district court has broad discretion in determining whether a moving party has set

---

[4] In <u>Howard</u>, the Ninth Circuit held that the police does not have probable cause to believe that a parolee lives at an unreported residence when (1) visits to the parolee's reported address suggested that the parolee continued to reside there; (2) the police watched the address in question for a month and did not see the parolee there; (3) no credible witness had seen the parolee at the address in question for some time before the search; (4) the parolee did not have a key to the residence in question; and (5) neither the parolee nor his purported co-resident admitted to his residence there.

forth a factual dispute meriting an evidentiary hearing. <u>Id.</u> Local Criminal Rule 12-1.1. states that "[a] motion to suppress shall be supported by a declaration on behalf of the defendant, setting forth all facts then known upon which it is contended the motion should be granted." Local Cr. R. 12-1.1.

Defendant's motion contains an <u>unsigned</u> declaration going to his purported standing and a declaration from his counsel regarding whether his parole agent had been contacted by officers. Defendant relies solely on the facts set forth in the investigative reports produced in the government's discovery and conjecture. <u>See generally</u> Deft's Mot. Because defendant fails to put forth any contradictory <u>facts</u> with regard to his drug trafficking activities or the probable cause officers had to believe that he lived at the Arlington Avenue Residence and that he controlled the car in question, no evidentiary hearing is required.

**IV.**

**CONCLUSION**

For the foregoing reasons, defendant's motion to suppress should be denied.

Dated: July 22, 2010          Respectfully submitted,

ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
CAROL A. CHEN
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA